ROBERT TILLSON, Appellant, *v.* CHARLES F. MOULTON *et al.,* Appellees.

### APPEAL FROM ADAMS.

A deed of real estate, absolute in its terms, if intended as security for a debt, will be held both at law and in equity as a mortgage.

And the fact that the land was conveyed as security, may be proved by parol, even though a written defeasance may be in existence. A mortgage by a *cestui que trust* will be sustained in equity, as if he were the legal owner.

THIS was a bill in chancery by appellant against appellee and others, to foreclose a mortgage. The facts are fully stated in the opinion of Mr. Justice BREESE. The cause was tried in the Adams Circuit Court, SIBLEY, Judge, presiding.

BROWNING & BUSHNELL, for Appellant.

WILLIAMS, GRIMSHAW & WILLIAMS, for Appellees.

BREESE, J. The questions presented by this record are, had John Tillson, Sen., such an interest in the S. E. 36, 1 S., 9 W., as warranted the mortgage to complainant, and has complainant in equity a lien upon such interest? And next, how should the account be stated between John Tillson, Sen., and the defendant, Moulton?

The defendant insists that the legal title to this land was vested in John Tillson, Jr., who had no beneficial interest in it, but held it together with lots four and seven, being part of the north-east quarter of the north-west quarter of section four, in town thirty-nine north, range fourteen east, attached to Chicago, and lots two and three in block twenty-two, in Kinzie's addition to Chicago, in trust for the defendant, Moulton, by the first decla-

ration of trust, dated July 7, 1849, it being recited therein that defendant had paid the purchase money for the lands.

That the second declaration of trust, executed on the 7th of May, 1851, by John Tillson, Sen., and the defendant, Moulton, recites an advance by Moulton of ten thousand five hundred and sixty-six dollars, in connection with these lands, and provides that John Tillson, Jr., shall make deeds for sales to be made by John Tillson, Sen.; that taxes shall be paid out of the proceeds; the $10,566, with seven per cent. interest thereon, shall be paid out of the proceeds, and the balance be divided between Moulton and John Tillson, Sen. That on the same day, it was agreed between these parties that no sale of the whole, or any large portion of this property, should be made, without advising Moulton; and it was further agreed, on the same day, between these parties, that this property should be held by John Tillson, Jr., for the joint benefit of Moulton and John Tillson, Sen., upon the terms and conditions of the agreement of May 7, 1851. That, at this date, John Tillson, Sen., rendered Moulton an account in which he, according to his own showing, was indebted to Moulton, on these land transactions, in the sum of nineteen thousand six hundred and fifty-seven dollars, fifty-seven cents. That the deed of trust to Castle, for the benefit of Marston, was a violation of trust by the Tillsons, and the deed of John Tillson, Sen., purporting to act as the attorney of John Tillson, Jr., mortgaging the interest of John Tillson, Sen., in the S. E. 36, 1 S., 9 W., to the complainant, was a further violation of the trusts, he having no authority from John Tillson, Jr., so to mortgage it. That J. Tillson, Jr., for a valuable consideration, had, prior to this mortgage to complainant, conveyed by absolute deed this quarter section to Luther C. Clark, and that Moulton, to protect himself, had, before this suit was commenced, purchased the land of Clark, and received a conveyance from him therefor, having paid Clark $7,657.47 for his title.

Under these facts, as defendant supposes them to exist, he insists that the mortgage of Tillson, Sen., to the complainant, passed no title to him, either legal or equitable, in the land, or its proceeds, the legal title being in J. Tillson, Jr., and under a power to sell he could not mortgage. That Tillson, Sen., had no power of attorney from J. Tillson, Jr., to mortgage the land. That the attempted mortgage was a nullity; the conveyance to Clark, at the instance of Tillson, Sen., passed the title to Clark, and operated as a forfeiture by Tillson, Sen., of any right to a share of the proceeds of this land. That the utmost which can be claimed by the complainant, on the admission that the mortgage to him was valid, is, an interest in the residuum, after an

equitable settlement of the accounts between Tillson, Sen., and Moulton. That at best, it was the transfer of a mere equity. That complainant having got but an equity, he must take it *cum onere*, and submit to an account, and in taking that account, this tract and its proceeds cannot be separated from the other land transactions between the parties. The defendant then states an account between the parties, in which he includes the indebtedness of Tillson, Sen., to Moulton, on general account, showing no margin out of which to pay the complainant anything.

The complainant insists that he is entitled in equity to a lien on the proceeds of the sale of this quarter section. That he advanced the money on the faith of it, and to save it from an irredeemable sale under the deed of trust held by Castle for the benefit of Marston, to whom it was executed as security for the purchase money due upon it. That the position of the parties, John Tillson, Sen., and Moulton, is to be determined from the declaration of trust made between them, on the 7th May, 1851. That the mortgage executed by John Tillson, Sen., to complainant, on this quarter section, was valid for the purposes for which it was executed. That the conveyance to Clark, though absolute on its face, was subject to a defeasance, and known to be so subject, to Moulton, when he purchased, and that he can set up no claim under that purchase, to defeat such interest as John Tillson, Sen., had in the land, and that in stating the account between Tillson, Sen., and Moulton, such account should be restricted to the special indebtedness with which this land was chargeable, and to no other indebtedness.

The various propositions have been ably discussed by counsel, and with the lights and arguments with which they have favored us, we have but little difficulty in arriving at what we believe to be a correct conclusion upon the whole case.

We are well satisfied that on the seventh of May, 1851, there was a complete adjustment and settlement in regard to all the land transactions between John Tillson, Sen., and Moulton. The declaration of trust, of July 7, 1849, was made by John Tillson, Jr., to Moulton, and contains a very large quantity of lands situate in different and many counties of this State, and embracing many thousand acres, besides the Chicago lots and this Quincy quarter section. This declaration recites, that these lands were purchased with the money of Moulton, and that all the money which should be received on their sale belonged to Moulton. At this period, John Tillson, Sen., was largely insolvent, and took titles in the name of his son, John Tillson, Jr., Moulton furnishing the means by which the purchases were made. Moulton was domiciled in France, and it became expedient that some cover should be had for the pro-

tection of John Tillson, Sen., hence, the deeds to Tillson, Junior, and his declaration of trust.

The record shows that the declaration of trust, of May 7, 1851, was between John Tillson, Sen., and Moulton, modifying and changing essentially the terms of the declaration of July 7, 1849. It is as follows:

"This agreement, made this seventh day of May, in the year one thousand eight hundred and fifty-one, between John Tillson, now in the city of New York, of the first part, and Charles F. Moulton, now in the same place, of the second part; whereas, John Tillson, Junior, son of the said party of the first part, now holds in trust and without any beneficial interest therein, the following parcels or tracts of land, situated in Illinois, that is to say, S. E. 36, 1 S., 9 W., containing one hundred and sixty acres, situated in Adams county, in the State of Illinois, and adjoining the city of Quincy, in said county and State; lots number four and seven, in subdivision of the north-east of the north-west quarter of section four, township thirty-nine north, in range fourteen east of third meridian, as laid off by the State Bank of Illinois, and attached to the city, containing ten acres, including the streets, be the same more or less; also number two, and eleven feet off east side lot number three, in block number twenty-two, in Kinzie's addition to Chicago; which trust, and the disposition of the said real estate are at the entire control of the said party of the first part; and whereas, the said party of the second part, did, on the 7th day of May, instant, advance and pay the said party of the first part the sum of ten thousand five hundred and sixty-six dollars, ($10,566,) in order to become jointly interested with the said party of the first part, and as the consideration therefor in the said lands, in the manner and to the extent hereinafter stated; now therefore this agreement witnesseth, that the said parties hereto have mutually contracted and agreed, and hereby do mutually contract and agree, to and with each other, as follows, that is to say : the said party of the first part shall proceed to make sales of the said lands, from time to time, and as desirable opportunities shall offer, and that said John Tillson, Jun., shall duly execute, acknowledge, and deliver deeds therefor, as directed by the said party of the first part, and the proceeds of the said sales shall be received by the party of the first part, and after deducting the amount of taxes paid on the said premises since they were purchased, in the year one thousand eight hundred and forty-eight, as well as those hereafter to be assessed on the same, up to the time of such sale or sales, to be by him, the party of the first part, deposited from time to time, and with all convenient dispatch, in the New York Life Insurance and

Trust Company, to the credit of the said party of the second part, and duly indorsed on this agreement by the said New York Life Insurance and Trust Company, until the whole of the aforesaid advance of ten thousand five hundred and sixty-six dollars, with all the interest thereon, at the rate of seven per cent. per annum, shall be fully paid and reimbursed, unless the said party of the second part shall hereafter direct the said payment to be otherwise made and appropriated, in which case, such directions shall be promptly and faithfully complied with, and all sums or proceeds realized for the real estate beyond the said sum of ten thousand five hundred and sixty-six dollars, with the interest thereon as aforesaid, shall be equally divided by and between the said parties hereto. And it is further mutually agreed, that the said party of the first part shall be the agent for effecting sales of the said premises, according to the true intent and meaning hereof, but shall not be entitled to charge the concern any commission or other compensation for his agency, beyond his actual disbursements, which shall not include traveling expenses; and the said party of the second part shall be deemed beneficially interested in the said lands, to the extent provided for herein, and that the said John Tillson, Jun., shall and will in all respects follow and obey the instructions and directions of the said party of the first part in regard to the execution, acknowledgment and delivery of the said deeds, and that the said party of the first part shall be responsible for the purchase money, and the disposition or other appropriation thereof, according to the true intent and meaning of this agreement; and that the said John Tillson, Jun., shall be deemed and taken as holding the title to the said lands, for the use and purposes herein expressed, and for no other. Witness the interchangeable signatures of the parties hereto, the day and year first above written.

(Signed,)     JOHN TILLSON.    [SEAL.]
C. F. MOULTON.    [SEAL.] ''

On the same day, and at the same place, the parties made a further agreement under their hands and seals, by which, referring to said agreement, it was provided that, '' notwithstanding the power thereby given to the said John Tillson, Sen., as to the entire control and management of the property therein mentioned, yet no sale of the whole, or of a large portion thereof, should be made without consulting or advising with said Moulton, it being the intention of the parties to divide the Quincy lot into eighty parts, or in like manner as Nevin's addition lot, and to sell the same in preference, to persons who will build or improve the lots, and thus give increased value to the remainder; and that in the reimbursement of the principal sum of $10,566,

and interest, or at the expiration of five years, the balance of the property remaining unsold should be divided by lot equally between them."

The record shows further, by Exhibit " G," that on the same day the parties entered into a further agreement, by which, referring to the declaration of trust executed by John Tillson, Jr., July 7th, 1849, it was provided that John Tillson, Jr., had been, by the agreement of the 7th May, 1851, released, and was by this further agreement released, from all liability on account of the trust of the 7th July, 1849, except as to the S. E. 36, 1 S. 9 W., and the Chicago property, being lots four and seven, and lots two and part of three, hereinbefore described as included in the declaration of trust of the 7th July, 1849, and also in the agreement of the 7th May, 1851, and that the declaration of trust of the 7th July, 1849, has been so modified that hereafter the S. E. 36, 1 S., 9 W., and the Chicago property, were to be held by John Tillson, Jr., for the joint benefit of C. F. Moulton and J. Tillson, Sen., upon the terms and conditions of their agreement of the 7th May, 1851, a copy of which, J. Tillson, Sen., was to furnish J. Tillson, Jr., and that all the other real estate mentioned in the trust deed of July 7th, 1849, had been purchased by John Tillson, and released to him by Moulton.

The recitals in these agreements are conclusive on the facts, that Moulton advanced ten thousand five hundred and sixty-six dollars, in order to become jointly interested with Tillson in the Chicago property and the Quincy quarter section, and that the other lands described in the declaration of trust of July 7th, 1849, by John Tillson, Jr., had been paid for by Tillson, Sen., and released to him by Moulton. The declaration is plain and explicit as to all the purposes and objects for which it was executed, and the parties must be bound by it, and this case must be viewed from that standpoint.

The Chicago property, undisposed of, and the Quincy quarter, which was held from that time forth by John Tillson, Jr., as the trustee, was all the property in which Moulton had any interest, and that interest was the charge upon it of $10,566, and interest, and nothing more. This debt, and this only, was, at that date, chargeable on this fund — it was burdened with no other debt. The agreement of May 7th, 1851, by strong implication, admits that the lands, at that time, belonged to John Tillson, Senior, and in order to get an interest in them, Moulton had advanced the above amount. That Tillson had the exclusive right to sell them and to control the trust, and after Moulton should have been paid his advance, the balance of the proceeds of the land, or the balance of the land unsold, was to be equally divided between them. It is made a common property in which

each has an equal interest, subject to the prior claim of Moulton for the sum he advanced.

The complainant then, in taking the mortgage, had a right to rely on these declarations of the parties, and to deal with Tillson as having a beneficial interest in the residuum.

We will now inquire how the complainant became connected with this Quincy quarter, and from what facts the equity he may be supposed to have, arose.

It appears from the record that the quarter was purchased by John Tillson, Sen., of one Skiddy, in October, 1848, and the deed taken to John Tillson, Jr., he, at the same time, executing to Skiddy a mortgage for $4,000, part of the purchase money. To pay off this mortgage, the money was borrowed by Tillson, Nov. 3, 1849, of one Marston, and a deed of trust executed to one Castle, conveying the land as security. Skiddy's mortgage was thus paid, and the mortgage satisfied of record, December 31, 1849.

The four thousand dollars was borrowed of Marston on two notes, of two thousand dollars each. The first was paid about the time it became due, Nov. 3, 1849. The second note became due Nov. 3, 1851, and remained unpaid until May 3, 1853, when it became necessary to make arrangements to pay, a sale under the deed of trust, from which there is no redemption, being threatened.

At this juncture, John Tillson, Sen., executed a note to Marston, with complainant as his surety, for twenty-two hundred dollars, the amount of principal and interest due, payable in thirty days, on which the property was released from the deed of trust.

To secure the complainant for his suretyship, John Tillson, Senior, in the name of John Tillson, Jr., and professing to act as his attorney, executed a mortgage to complainant on this quarter section. The mortgage was dated May 6, 1853, and recorded March 11, 1854.

The record further shows, by the answer of Moulton, that soon after the execution of this note and mortgage to complainant, in the same month of May, 1853, John Tillson, Sen., died in the city of New York, insolvent. The note had not then matured. Complainant paid it, and now asks that his lien may be enforced against the land, or the proceeds of its sale.

It appears by the record, that in November, 1851, John Tillson, Sen., borrowed a large sum of money of Clark & Co., and caused John Tillson, Jr., to convey this land to L. C. Clark, the leading member of the firm, by an absolute deed. It does not appear that Tillson, Jr., knew the object of this conveyance; that Moulton was residing in France, his business in this country

being attended to by one Ely, residing in the city of New York. Mr. Ely, as agent of Moulton, in January, 1854, paid off this loan to Clark, with the interest which had accrued, and all the expenses connected with the transaction, took an assignment of the drafts and other papers representing Tillson's debt to Clark & Co., and also a deed from Luther C. Clark to Moulton, for the land. This deed was recorded March 14, 1854, subsequent to the recording of Tillson's mortgage to the complainant.

This was done by Ely, as agent of Moulton. After the original bill was filed in the cause, and in virtue of this deed, Moulton, on the 22nd Dec., 1854, caused the tract to be divided into small lots, and sold them for a sum exceeding forty thousand dollars, and claims a right to hold the entire proceeds as his own.

To meet these facts, an amended bill was filed by complainant, alleging that the deed to L. C. Clark, although absolute on its face, was but security for the loan Tillson had of them, and so known to Ely at the time he took the assignment of the drafts, etc., and the deed to Moulton, and prays that the proceeds of this sale may be applied to complainant's mortgage.

We think the proof shows conclusively, that the deed to Clark was but a security for the debt of Tillson, and that Ely was so informed when he took the deed. He took this deed, not as a purchaser of the land, but simply by paying the debt to Clark & Co., and thus substituting Moulton as the creditor instead of Clark & Co., with the right, on settlement with Tillson, to charge this amount thus paid Clark & Co., against Tillson's interest in the land. If not so, why was an assignment of Tillson's papers taken? The transaction simply amounts to this, that Moulton paid the mortgage debt to Clark & Co., and under his deed from L. C. Clark, held the property as Clark held it—as security only, Moulton well understanding that on an adjustment of their several rights and equities, he would be entitled to set it up as a charge against the land.

It is objected, however, that the proof that this land was conveyed to Clark as security merely for a loan, is wanting—that there was no sufficient evidence of that fact—that the deposition of Edward Chase, taken to prove it, was inadmissible.

Chase, in his deposition, gives a copy of a paper entrusted to him by J. Tillson, Senior, for safe-keeping, signed by Luther C. Clark, bearing date on the day of the execution of the deed to him by Tillson, which is to all intents and purposes, in equity, a defeasance. The original was not produced, and the excuse given by complainant is, that it was not in his power, nor was the witness; that he resided in another State, to which our process did not reach, and a subpœna *duces tecum* would have

been ineffectual. But we do not think the original defeasance should have been produced; neither the complainant nor Moulton were parties to it, nor had they any power over it. The question was not, was there a written defeasance, nor as to its particular terms. The only question was as to a fact—did Tillson convey the land to Clark as security for an advance of money? If he did, then Clark was a mortgagee only, and this may be proved by parol.

It has been held, that proof of a sale of goods or payment of money, may be made by parol, though there be a receipt, without accounting for its absence; parol proof being of as high a nature as the receipt. *Southwick* v. *Heyden*, 7 Cowen, 334. In strictness of law, a mere written agreement not under seal, and a verbal agreement, are regarded as of the same dignity. The leading distinction is between contracts by specialty and those by parol.

The testimony of Ely, the agent of Moulton, in making the arrangement with Clark, shows clearly, that he had this information from Clark—that Clark told him before, and at the time he made the deed, that he held the land as security only, and Tillson's administrator had also given him the same information, and the fact that Ely paid the money on Tillson's indebtedness, and took an assignment of these securities to Moulton, is a strong admission of the fact. An assignment of a mortgage debt is an assignment of the mortgage. *Lucas* v. *Harris et al.*, 20 Ill. R. 165.

The fact, then, that Clark held this land as security only, we deem sufficiently proved. This court has frequently decided, that a deed of real estate, absolute in its terms, if intended as security for a debt, will be held, both at law and in equity, as a mortgage. It is always a question of intention, which can be established by parol evidence. *Lane, qui tam*, v. *Shears*, 1 Wendell, 433; *Miller et al.* v. *Thomas et al.*, 14 Ill. R. 428; *Delahay* v. *McConnel*, 4 Scam. 157.

The maxim in equity is, once a mortgage, always a mortgage, and the true character of every conveyance of land is open to inquiry and investigation, no matter what form the parties may have given the transaction. *Wynkoop* v. *Cowing et al.*, 21 Ill. R. 580.

Moulton, then, by his deed from Clark, took the title which Clark had, and is affected by all the equities in favor of third persons. *Pendleton and Wife* v. *Fay et al.*, 2 Paige Ch. 206. John Tillson's right to an interest in the land, is in no way affected by this arrangement of Ely's for Moulton. Tillson still remained as he was before, one of the *cestuis que trust* in this entire tract of land. The question now arises, if he had such interest,

could he lawfully mortgage it? We can discover no reason in law or justice, why he should not have this power. He had an interest in it, if the fee was in another person, and why he should not secure one who advanced the money to save the whole tract from total loss, if the creditor was willing to take it, we cannot discover. It was trust property, but John Tillson, Senior, was one of the two *cestuis que trust,* the other having no preference over the proceeds of the land, except to the extent of his advances to purchase it and to reclaim it from the Clark mortgage. All the books acknowledge a right in the *cestui que trust* to receive the profits and to dispose of the land in equity. 1 Maddox Ch. 451, 453.

Chancellor Kent says: The *cestui que trust* may convey his interest at his pleasure, as if he were the legal owner, without the technical forms essential to pass the legal estate. 4 Kent's Com. 303. It would seem to us, that Tillson, Senior, had as perfect a right to give this security to the complainant, as he would have had to secure him by the conveyance of any other property to which he had a legal or equitable title. It could, in no way, affect Moulton's interest in the trust property, so that he should not complain. This land might have been sacrificed for the Marston debt, had not complainant so opportunely stepped in to save it, as well for Moulton as for Tillson, Senior. The existing indebtedness to Marston—the deed of trust in the hands of Castle—executing the note to Marston and making this mortgage, are all so knitted to each other, as to amount to the strongest persuasive evidence, that the note was executed by complainant with the understanding he should have this security. It was a meritorious transaction, by which Moulton was much benefited.

As to the objection, that no authority is shown from John Tillson, Jr., to make this mortgage, it is a sufficient answer to say, that John Tillson, Jr., is one of the defendants to the bill of complaint, and the bill is taken as confessed against him. As to him, the fact is admitted, for all the purposes of this controversy, that the mortgage was properly made. He has not denied the authority of John Tillson, Sen., to make the mortgage.

But if this be not so, equity regards substance rather than form, and the substance of this transaction was, if complainant would secure the payment to Marston, and save the land from the deed of trust, he should be made secure by the land. Tillson was dealing with a fund in which he had an interest, and had a perfect right to pledge it for any legitimate purpose. As it does not affect Moulton's interest injuriously, he has no right to complain. Tillson having, in good faith, and for a most meritorious purpose, undertaken to pledge this fund, a court of equity,

42

disregarding the form in which it has been done, will enforce the lien so created.

Finding, then, that John Tillson, Sen., had such an interest in this fund as could be pledged, we can see no ground of claim on the part of Moulton to charge it with claims which were not, when the fund was created, May 7, 1851, chargeable to it. That agreement is clear and distinct. There can be no pretense to charge it with other debts Tillson owed Moulton, unconnected with this land, certainly not to the exclusion of the specific lien of the complainant upon the fund. A specific lien has never yet been known to be cut off by a general equity.

As to those debts, there is no propriety whatever in placing them on a better footing than those of any of the general creditors of Tillson. As to those debts, Moulton must take his chances with other creditors. It would be iniquitous to postpone a specific lien to them.

The decree of the court below is reversed, and the cause remanded, with direction to that court to refer the cause to the master, to find the total amount for which Moulton sold the south-east quarter of section 36, town 1 south, range 9 west, adjoining Quincy, in Adams county, and charge him therewith.

Charge this fund with the amount advanced by Moulton, in order to become interested in it, and interest, for which he is entitled to a credit. Then divide what remains into two equal portions.

From one portion, accruing to Tillson, deduct the money paid by Moulton to L. C. Clark, to redeem the land from Clark's mortgage, and the interest and expenses. Also deduct fifteen hundred dollars and interest thereon, from the sale of the Chicago property to Newberry. Deduct, also, one-half the expenses Moulton incurred in dividing and selling the quarter section.

On the balance remaining, interest will be calculated to the time of computation, out of which the complainant will be satisfied his lien, being the amount of his mortgage on this fund, and interest thereon. The defendant, Moulton, will pay the costs.

*Decree reversed.*