## ELISHA RUCKMAN *et al.*

### *v.*

## SARAH ALWOOD *et al.*

1. EVIDENCE—*parol, to show a deed a mortgage.* If the grantee in a deed absolute upon its face, intended only as a security for a debt, fraudulently attempts to set up the deed as an absolute conveyance, the original design of the conveyance, though contrary to the terms of the writing, may be shown by parol, and the fact that the deed was intended only as a security, may be shown by the declarations and admissions of the grantee.

2. WITNESS—*competency of party as against one suing as heir.* On bill filed by the heirs of a deceased grantor, to have his deed declared a mortgage, and to redeem from the same, where witnesses, not parties to the record, or parties in interest, or agents of the deceased, testify as to admissions made by the grantee in the presence of the deceased grantor, and not in his absence, the grantee is not a competent witness to testify as to the same admissions or conversations.

3. In such a suit, the grantee is not a competent witness to prove a settlement between him and the deceased grantor at the time of the execution of the deed of conveyance, and the amount found to be due him, the consideration for the deed, or to anything occurring at the time between him and the deceased, such as giving his note for the balance due for the land conveyed, or its subsequent payment.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. SABIN D. PUTERBAUGH, Judge, presiding.

This was a bill in equity, filed November 26, 1856, in the Mason circuit court, by the heirs at law of Andrew J. Alwood, deceased, who died intestate, against Elisha Ruckman and Caroline, his wife, for the purpose of having an absolute deed, made February 26, 1856, by said Alwood to Elisha Ruckman, of lands therein described, declared a mortgage, and for leave to said heirs of the grantor to redeem.

The bill alleges an indebtedness existing from Alwood to Ruckman, at the time of making the deed, of $416, upon a promissory note for money loaned, to secure which, together with such other sums as Ruckman should advance, Alwood

executed this deed to Ruckman, who was a relative, as mere security; that the further sum advanced was only about $1000, making in all an indebtedness of about $1400, while the lands covered by the deed were at the time worth about $20,-000, there being about 1500 acres of them; that Alwood kept possession of the lands until his death, which occurred in October, 1856.

The bill alleges a parol defeasance, and that, upon Alwood's death, Ruckman fraudulently set up said deed as an absolute conveyance. The necessity of an answer on oath was expressly waived in the original bill, in the amended and supplemental bills.

The original, amended and supplemental bills, constituting but one record, a detailed statement of them is in no respect necessary to a correct understanding of the case. Pending the suit, Benjamin Alwood, one of the heirs of A. J. Alwood, died intestate, leaving the other complainants in the original bill, his heirs at law. Hugh M. Alwood and Esther Phillips, who, with Sarah Alwood, constituted the remaining heirs, conveyed their interest in the lands to Sarah Alwood. These facts were introduced into the record by supplemental bill.

In April, 1858, Ruckman filed an answer, in which he admitted that he loaned Andrew J. Alwood money before the execution of said deed, but at what time or to what amount he did not then remember, and was not able to determine; that said Alwood made and delivered to him the deed mentioned in the bill for the lands therein described, but positively denied that they were conveyed to secure the payment of the sums of money which had been or might thereafter be loaned by him to said Alwood, or that said deed was intended as a mere mortgage, and averred that said deed was an absolute and unqualified transfer of said lands for a valuable consideration mentioned in said deed. In this answer Ruckman does not pretend to set out what the consideration of the deed was, further than as just stated, and avers that he did not remember, and was not able to determine what amounts

he had loaned to A. J. Alwood, but, in August, 1868, ten years after that answer was filed, Ruckman and wife filed another answer, in which it is averred that, at the time the deed was made, he, Ruckman, had a settlement with Alwood as to all the moneys he had loaned to and advanced for the latter, and Alwood was then found to be indebted to him in the sum of $9400, besides the sum of $416 for land warrants which he had loaned Alwood; that the whole amount he was to pay Alwood for the lands was $14.400, to make up which, said sum found due on settlement was applied, and then he gave Alwood his promissory note for $5000, the balance of the purchase money. This note he avers he paid in different sums, but that, in June, 1856, he paid him the balance, being about $3000, in cash. He also averred that Alwood remained in possession as his tenant. Replication was filed. The cause was transferred to Peoria county circuit court, where it was heard upon pleadings and proofs, and, in June, 1870, a decree was rendered declaring that said deed was intended by the parties as a mortgage to secure an indebtedness from Alwood to Ruckman, the amount of such indebtedness ascertained, and decree allowing redemption by the heirs on payment of the amount so found due.

Upon this decree the defendants sue out a writ of error from this court.

Messrs. DEARBORN & CAMPBELL, for the plaintiffs in error.

Messrs. LACEY & WALLACE, and Mr. S. P. SHOPE, for the defendants in error.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

This was a bill in equity, brought by the heirs at law of Andrew J. Alwood, deceased, to turn an absolute deed of lands, given by the intestate February 26, 1856, to Ruckman, into a mortgage, by parol proof.

Alwood died about October 1, 1856, intestate. There is no controversy as to his being the owner of the lands at the time of the deed, or as to complainants being his sole heirs at law; nor as to the relation of debtor and creditor existing between him and Ruckman at that time.

It is alleged in the bill that the relation of debtor and creditor, in respect to the money forming the consideration of the deed, was, by agreement, still subsisting between the parties, and that a re-conveyance was to be made by the grantee upon the payment of that money. Assuming this to be so, it would be a fraud in Ruckman to set up that deed as absolute, after the death of Alwood, as has been done. *Metropolitan Bank* v. *Godfrey*, 23 Ill. 604. And upon this ground parol evidence would be admissible to show the truth of the transaction. "If a grantee fraudulently attempts to convert into an absolute sale that which was originally meant to be a security for a loan, the original design of the conveyance, though contrary to the terms of the writing, may be shown by parol." 1 Hil. on Mort. pp. 31, 32, 33, and authorities in notes; *Wright* v. *Bates*, 13 Verm. R. 349; NELSON, Ch. J., in *Patchin* v. *Pierce*, 12 Wend. 61; *Morris* v. *Nixon*, 1 How. (U. S.), 118; 1 Sug. on Vend. Vol. 1, p. 174, (8th Am. Ed.) and cases cited in notes.

In *Purviance et al.* v. *Holt*, 3 Gilm. 405, the rule was broadly asserted that. "whatever covenants an absolute deed may contain, parol evidence may be admitted to show that it was intended as a mortgage, or mere security for the payment of a debt, and the grantor can have relief in equity."

And again, in *Ferguson* v. *Sutphen*, ib. 570, the court say: "But whatever may be the correct rule at law, on this question, in equity the doctrine is firmly settled that a conveyance, absolute in its terms, may, by parol evidence, be shown to have been designed by the parties as a mortgage."

So, also, in *Miller* v. *Thomas*, 14 Ill. 431, it was said: "Indeed, it is not absolutely necessary that the defeasance should be in writing at all. The conveyance may be absolute on its

face, and yet it may be shown by parol that it was intended only as a security for the payment of money, when it will be treated in equity as a mortgage." *Williams* v. *Bishop.* 15 Ill. 554; *Shaver* v. *Woodward*, 28 Ill. 277; *Preschbaker* v. *Feaman et al.* 32 Ill. 483; *Sutphen* v. *Cushman*, 35 Ill. 186; *Reigard* v. *McNeil*, 38 Ill. 400.

It will be perceived that in none of these cases did the court attempt to range the jurisdiction to turn an absolute deed into a mortgage, by parol evidence, under any specific head of equity, such as fraud, accident or mistake; but the rule seems to have grown into recognition as an independent head of equity. Still it must have its foundation in this, that where the transaction is shown to have been meant as a security for a loan, the deed will have the character of a mortgage, without other proof of fraud than is implied in showing that a conveyance, taken for the mutual benefit of both parties, has been appropriated solely to the use of the grantee. For when we seek in the standard authorities for the ground or principle upon which the doctrine of the admissibility of parol evidence originally rested, it will be found in the old and familiar heads of equity, such as fraud, accident, mistake or trust.

Chancellor KENT, 4 Com. 143, states the doctrine thus: "A deed, absolute on the face of it, and though registered as a deed, will be valid and effectual as a mortgage. as between the parties, if it was intended by them to be merely a security for a debt, and this would be the case. though the defeasance was by an agreement resting in parol. for parol evidence is admissible in *equity* to show that an absolute deed was intended as a mortgage, *and that the defeasance has been omitted or destroyed by fraud, surprise or mistake.*" See authorities in note (a).

STORY, speaking of the same subject, says: "Even parol evidence is admissible in *some* cases, as in cases of *fraud, accident and mistake*, to show that a conveyance, absolute on its face, was

intended between the parties to be a mere mortgage or security for money." 2 Eq. Jur. sec. 1018, note 2.

It is therefore apparent, from this cursory review of the decisions of this court, and the authorities outside of them, that counsel for appellant are entirely mistaken in their position, that this court has limited the doctrine of the transmutation by equity of a deed. absolute on its face. into a mere mortgage, to cases where there was a defeasance in writing; for, in *Tillson* v. *Moulton et al.* 23 Ill. 648, the question was made, that parol evidence was not admissible, because there existed a defeasance in writing which was not produced, and the court, by Breese, J., said: "But we do not think the original defeasance should have been produced; neither the complainant nor Moulton were parties to it, nor had they any power over it. The question was not, was there a written defeasance? nor as to its particular terms. The only question was as to a fact: did Tillson convey the land to Clark as security for an advance of money? If he did, then Clark was a mortgagee only, and this may be proved by parol." This seems, to the writer, to be carrying the doctrine quite too far. If there be a written defeasance, and no fraud or mistake, upon what principle can a court say that its terms should not govern privies as well as parties?

But the case at bar falls directly under one of the established heads of equity, viz: fraud, which is distinctly charged in the bill, and which the evidence fully sustains.

It appears, by the evidence, that Andrew J. Alwood, residing upon a portion and being in possession of the lands in question, was beset and persecuted by mob-violence, which resulted in the burning, by this class of lawless conspirators, of all his crops and buildings, just before the making of this deed. He was the owner of this large body of lands, choice and valuable, but most of them new and uncultivated. He was pressed for means with which to develop these new lands so as to make them profitable. Ruckman was a cousin, and evidently professing to feel a friendly interest in the welfare of

deceased and his family.    He lived in the State of New Jersey, and was a man of means.   He had already loaned A. J. Alwood the sum of $416, for which he held his note.   He was fully aware of the troubles to which his debtor cousin had been subjected, and he himself admits that he suggested to Alwood the idea of conveying his property to him as a means of avoiding the persecutions of the conspirators referred to.    The evidence clearly shows that it was a controlling motive, in making the conveyance, to obtain a loan of more money from Ruckman, and at the same time escape the further destruction of the crops and improvements upon the land, by having it understood in Mason county, where Alwood lived, that he had ceased to be the owner of the lands.    This motive is one which the law does not condemn.    It was not to hinder, delay or defraud creditors, but was an endeavor to shield the grantor from the effects of mob-violence, from which he had already grievously suffered, and from which he anticipated further acts.    To carry out this purpose, and acting under the dread inspired by former violence, he seems to have taken special pains to have it understood by all prominent citizens of the county, that, although he was still in possession, he had ceased to have any interest in the lands or their products. This course, it seems, operated as protection to property, but the diabolical spirit which had vented itself in the former destruction of crops and buildings, was soon directed against his person, and about the 1st of October, 1856, he was assassinated.

Ruckman, as is clearly inferrible from the evidence, was cognizant of all the circumstances by which Alwood was surrounded previous to his assassination, and, in the latter part of June, 1856, came on a visit to Alwood's residence.    While there he undoubtedly became aware of the open manner in which Alwood had avowed the fact of a sale to him, and was fully cognizant of the motive which dictated the avowal.    He then had not conceived the idea of wresting the property from him by setting up the deed as absolute.    He then in-

11—71st ILL.

quired of Alwood, in the presence of persons who were not parties to the record, when he thought he would be able to pay him the amount of his debt for the money loaned. The amount was specified, and he, in the most emphatic manner, avowed his willingness to re-convey when it was paid. These witnesses were in no respect impeached. They were wholly disinterested and fully corroborated by what he admitted to other equally disinterested witnesses in Alwood's presence.

Counsel for appellants insist that this evidence is not sufficient to satisfy the conscience of the Chancellor, because Ruckman himself contradicted it. If a competent witness for that purpose, his evidence was entitled to little credit. This property had appreciated to the value of about $50,000. It was a great and seductive prize for which he was contending, quite too much so for the virtue of Ruckman, as his whole course in this case abundantly shows. But he was not a competent witness to contradict these witnesses, who were not parties to the record, parties in interest, or agents of the deceased in respect to the matters in question.

The 1st section of the act of 1867 removes the common law disqualification as a witness, by reason of a person being interested in the event of the suit, as a party or otherwise.

The 2d section provides that, "no party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion, or in his own behalf, by virtue of the foregoing section, when any adverse party sues or defends as trustee or conservator of any idiot, lunatic or distracted person, or as executor, administrator, *heir*, legatee or devisee of any deceased person, or as guardian or trustee of any such heir, legatee or devisee, unless when called as a witness by such adverse party so suing or defending, and also except in the following cases, namely," then follow five enumerated cases. The counsel for appellants claim that Ruckman was competent within one of these enumerations, but they fail to point out which. It is perfectly clear that he was not competent within the first,

second, third or fifth. Was he within the fourth? It reads thus:

"4. Where, in any action, suit or proceeding, any witness, not a party to the record. or not a party in interest, or not an agent of such deceased person, shall, in behalf of any party to such action, suit or proceeding, testify to any conversation or admission by any adverse party, or party in interest, occurring before the death *and in the absence* of such deceased person, such adverse party, or party in interest, may also testify as to the same admission or conversation."

Now, the witnesses to whom we have referred were neither of them parties to the record, or parties in interest, or agents of the deceased, but the admissions of Ruckman, to which they testified, were in the presence of the deceased, A. J. Alwood, and not in his absence. Their evidence related to conversations between Ruckman and Alwood, consequently he was not competent to testify as to the same admissions or conversations; nor was he competent, under either of the exceptions to the second section, to testify as to the settlement between him and A. J. Alwood at the time of giving the deed, the amount found due, the pretended consideration for the deed, or to anything occurring at the time between him and the deceased, such as the giving of his note for the $5000, or payment of the same as stated by him, or the fact, as pretended by him, that the note for $416, which he then held against Alwood, was for land warrants, and did not enter into the consideration of the deed. But if he were competent, we are satisfied, from the whole case, that all these pretenses are false; that his ingenuity in fabricating facts was stimulated in proportion as these lands appreciated in value. When he filed his answer, in April, 1858, the transaction then being recent, he deliberately declared that he was wholly unable to determine how much money he had loaned to A. J. Alwood. But when he answered again, after the lapse of twelve years, and these lands had become immensely valuable, then he comes into court averring that, at the time of the conveyance,

he had a full settlement with A. J. Alwood of and concerning all the moneys he had loaned to or advanced for him, and that. upon such settlement, the amount due was ascertained to be $9400. Would any man, competent to do business, be likely to forget such a fact in two years after the transaction, and then remember it so clearly twelve years thereafter?

Then again, as to his pretense that he gave A. J. Alwood his note for $5000 at the time of the conveyance. Nothing of that kind is stated in his first answer, but his statement that he paid that amount to A. J. Alwood during the spring and summer of 1856, paying him the large sum of $3000 in cash, the latter part of June, is unquestionably false, and a sheer fabrication. If there is any fact in this case, which is clearly established by circumstances, it is that A. J. Alwood was hard pressed for money during that season, and it seems impossible that he should have received, in cash, the large amount of $3000 from Ruckman at the time the latter was there, in June, and no member of his family know anything about it, and he leave nothing to show for it at his death, which occurred in three months.

But this is not all. Ruckman, in his last answer and evidence, pretends that the note for $416, which he held against Alwood before and at the time of the conveyance, was merely for security that Alwood would return to him certain land warrants of a particular class, and that therefore, as it was not for money loaned, it formed no part of the consideration of the deed. · That note bore date at New York, November 25, 1854, and was for $416, payable on demand. On November 21, 1856, after the death of·A. J. Alwood, Ruckman, at New York, wrote a letter to a Mr. Coon, residing in Mason county, inclosing a copy of that note, and in the letter says: " I have a note of Andrew J. Alwood *for money I lent him* in the fall of 1854, and as it is, I think, impossible to come out this fall, I want you to present this, and it is a copy of the note. I would not bring it against his estate, but I may as well have it as to let others get it, etc." And the evidence

shows that he actually received part payment of it from Hugh
M. Alwood after the death of A. J. Alwood.    The amount of
money lent, as expressed in this note, we feel assured, from
the testimony, formed a part of the consideration of the con-
veyance, and as to which the relation of debtor and creditor
was still subsisting, as shown by the acts and declarations of
Ruckman in receiving part payment, and sending it to Coon
to be presented as a claim against the estate of A. J. Alwood.

The testimony of Glover, a commissioner of deeds, in the
city of New York, who drew the deed, and took Alwood's
acknowledgment, is comprised chiefly of presumptions and
suppositions.  He does say that he recollects there was a
settlement between the parties, of some kind, at the time of
the conveyance, and that Ruckman gave Alwood a note, and
*thinks* that he drew it.    But he can not state the result of any
settlement, nor does he recollect the amount of the note. or
what it was for, or that any money was paid.    The utter
indefiniteness of his testimony renders it of no weight what-
ever, standing alone, as it does, for Ruckman was not com-
petent to testify to these matters; and Donahue, who was in
Glover's office at the time, and signed the deed as subscribing
witness, says he does not recollect that any settlement was
made, note given or money passed.

Thus it will be seen that the case must be determined solely
upon the evidence of complainants' witnesses, four of whom,
at least, were wholly disinterested, and there is not a circum-
stance, so far as we can perceive, to shake their credibility.
Their testimony shows that, as late as the latter part of June,
1856, Ruckman was inquiring of Alwood when he thought
he could pay him back the money borrowed; then, by the
conversation between them, the amount was mentioned, to
secure which the deed was given, and Ruckman expressly
recognized his obligation to re-convey the premises when
such amount was paid.   He told various persons who applied
to purchase a portion of the lands, in Alwood's presence, that

the only claim he had upon it was a mortgage to secure $1200 or $1500.

The note of Alwood for $416, held by Ruckman, was clearly shown to have been given for money loaned in the fall of 1854, and it is natural to suppose, and clearly inferrible, from the circumstances in evidence, that this amount entered into the consideration of the conveyance.

Then, in addition to the application made by Ruckman to Alwood, in June, 1856, for payment of the entire indebtedness, we have the indisputable facts that, after Alwood's death, Ruckman set up this note as a claim against the estate of the former, actually received part payment of it, and directed his agent to collect the remainder. This evidence is clear and decisive that the relation of debtor and creditor, in respect of the money which formed the consideration, was still subsisting after the fact of the conveyance. This is a conclusive test of the character of the conveyance, and equity must declare it a mortgage.

Ruckman was well aware of the reasons which induced A. J. Alwood to hold out generally to members of the community, that he had made an absolute sale. This conduct was produced by fear and apprehension, well grounded, it seems, and amounting to moral compulsion.

For Ruckman, to attempt, after the assassination of his cousin, to shield himself by these declarations, occasioned by so grave a cause of alarm, in setting up this deed as absolute, was guilty, not only of a reprehensible breach of faith, but of an attempt to perpetrate a gross fraud, to the grievous injury of the heirs of the deceased. So that it is a clear case for the admission of parol evidence, under any class of authorities.

The omission from the deed of Hugh M. Alwood and Esther Phillips to Sarah Alwood, of the north-east quarter of section No. 13, described in the bill and decree, constitutes no ground for the reversal of the whole decree, wherefore the decree of the circuit court will be affirmed in all respects

except that part of it which requires appellants to convey the whole of said parcel to Sarah Alwood. As to that part, the decree is reversed, and the cause remanded with directions to the court below to so modify the decree as to require appellants, upon payment of the amount due, to convey to Sarah Alwood the whole of all the other parcels of land described, except said north-east quarter of section 13, and, as to that, to convey to her an undivided one-third of said parcel, unless said Hugh M. Alwood and Esther Phillips shall execute and produce in court their quit-claim deed of all their interest in said last mentioned parcel, in which case the court will require appellants to convey the whole of said parcel to Sarah Alwood. Appellants will be entitled to recover costs in this court.

Decree reversed in part, and cause remanded with directions.

*Decree reversed in part.*