42  339
143s 385

# Chicago & Eastern Illinois Railroad Company

## v.

## William R. Shelby et al.

*Injunction—Removal of Dams—Written Contracts—Parol Representations to Vary—Practice.*

1. It is not an unvarying rule that all conversations and representations antecedent to, and at the time of, the execution of a written contract, are merged in it. It has its exceptions, and courts of equity will indulge them to prevent injustice, where it would be accomplished through fraud, duress or mistake.

2. In such case the court will look beyond the terms of a single transaction, and any evidence, whether by correspondence or otherwise, tending to show the real nature of the contract, is admissible, and the court will give effect to the actual contract as disclosed by the written instrument, and such additional evidence.

3. Courts of equity will, in the enforcement of a contract, endeavor to execute the true intention of the parties, and to arrive at such intention, will, when necessary, consider extrinsic evidence.

4. When thus the true intent is disclosed the contract will be enforced, unless to do so would work a plain violation of the language employed in the written instrument.

5. If the intent as disclosed by the extrinsic evidence is so inconsistent with the plain language of the writing that to give it effect would make a contract entirely repugnant to the plain meaning of the words in the writing, the intent, as disclosed by the extrinsic evidence, must yield to the intent expressed by the words in the writing.

6. The law requires of every man good faith when he makes declarations upon which he knows others may act to their prejudice.

7. Upon a bill filed to restrain persons named from removing two dams situated in a certain stream to prevent the lowering of the water therein, complainant having purchased from defendants' testator a portion of an island in said stream for picnic purposes, this court holds that the continued use of the pool which bordered the island, as it existed at the time of the grant, was appurtenant to the island. That its existence was necessary to the enjoyment of the property for the uses for which it was sold by the grantor, and accepted by the grantee; that complainant did not exceed its corporate powers when it made such purchase, and that it is entitled to a decree restraining the destruction of the dams, and the lowering of the water to such an extent as to prevent boating.

[Opinion filed January 18, 1892.]

APPEAL from the Circuit Court of Kankakee County; the Hon. N. J. PILSBURY, Judge, presiding.

Mr. W. H. LYFORD, for appellant.

The agreement of the grantor that the dams should be maintained, and the pool remain full during the summer season, which preceded the final execution of the deed, as well as the agreements to open a road and to allow excursionists to

fish below the dams, which succeeded the execution of the deed, must be construed as forming with the deed the real contract of the grantor, to the performance of which he and his successors are bound.

In Freer v. Lake, 115 Ill. 662, which was a bill in equity to redeem certain premises from a mortgage which, on its face, was an absolute deed, it appears that Freer, on May 27, 1878, sent a letter to Lake containing a draft of a deed. In the letter Freer stated that he would perform certain things in relation to the property granted, which were not mentioned in the deed. Lake, relying upon the statements in the letter, executed the deed and delivered it. On page 667, the court said:

" What was the nature of the transaction and the relation of the parties after the delivery of the deed? The letter of Freer, written to the complainant, and the deed she executed, bearing the same date, are a part of the same transaction and constitute one contract." Stacey v. Randall, 17 Ill. 466, 468.

" Where two instruments are executed as a part of the same transaction and agreement, whether at the same time or at different times, they will be taken and construed together." Peugh v. Davis, 96 U. S. 332, 336.

" It is an established doctrine that a court of equity will treat a deed absolute in form, as a mortgage, when it is executed as security for a loan of money. The court looks beyond the terms of the instrument to the real transaction, and when that is shown to be one of security and not of sale, it will give effect to the actual contract of the parties. As the equity upon which the court acts arises from the real character of the transaction, any evidence, written or oral, tending to show this, is admissible. The object of the parties in such cases will be considered by a court of equity; it constitutes a ground for the exercise of its jurisdiction, which will always be asserted to prevent fraud or oppression, and to promote justice." See, also, Brick v. Brick, 98 U. S. 514, 516.

In Batavia Mfg. Co. v. Newton Wagon Co., 91 Ill. 230, 239, which is an action growing out of the construction of a deed conveying water privileges, the court said:

" What was the intention of the parties in using the language with reference to water power found in the deed of the Batavia Manufacturing Company to Levi Newton ? For if that intention can be ascertained as well from the attendant circumstances—the state of the parties and the state of the thing granted—as from the language employed in the deed, effect must be given to it." Hadden v. Shoutz, 15 Ill. 581, 583–586.

" In construing deeds, as other writings, courts must seek to ascertain and give effect to the intention of the parties; and for that purpose they may and will take notice of attendant circumstances, and by them determine the intention of the parties." * * * (page 583.) " The law must give a common sense construction to grants, and consider the state of things and the considerations in view of the parties at the time the grant is made, which moves them to its execution and acceptance." In United States v. Appleton, 1 Sumn. 492, Story, J., said : " It has been very correctly stated at the bar that in the construction of grants the courts ought to take into consideration the circumstances attendant upon the transaction, the particular situation of the parties, the state of the country and the state of the thing granted, for the purpose of ascertaining the intention of the parties. In truth every grant of a thing naturally and necessarily imports a grant of it as it naturally exists, unless the contrary is provided for." In this case the grant is of the land by metes and bounds, upon which the mill and dam were situated and in use, with its appurtenances. The mill and dam did not pass as an appurtenant to the land, but as a part of the land itself, as much as the soil upon which they were situated; and the right to enjoy them as they were then situated and enjoyed, passed as an appurtenant to the thing granted. The land without the mill was of but little value. The value of the thing granted consisted principally in the mill and the right to use and enjoy it. The grantor was there and knew this, and was well aware that the grantee expected that he was acquiring the right to use it as it was then enjoyed. The fact that he took a deed of the land which conveyed to him the mill, without its being par-

ticularly mentioned in the deed, by no means indicates that no importance was attached to the mill, and that the right to enjoy it as such was not in the contemplation of the parties."

(P. 585.) " I have thus adverted to the attendant circumstances of this conveyance, to see whether there was anything in those circumstances showing that it was the intention of the parties to grant nothing but the naked land itself, contained within the description in the deed, or whether it was the intention of the parties that the ordinary incidents which the law, at least *prima facie*, attaches to such a conveyance, should attend it. The circumstances clearly show that it was the positive and affirmative intention of both parties, that all the rights and privileges should pass by this deed which the law presumes, in the absence of such proof, they intended should be conveyed. Here the proof of intention and the presumptions of law are coincident."

In Schmohl v. Fiddick, 34 Ill. App. 190, which was decided by this court in 1889, a party executed a lease for a building containing an elevator. The lessee refused to accept the lease unless it contained a provision that the lessor should operate the elevator at his own expense. The lessor would not change the lease but said to the lessee: " What is the use of being so particular? We expect to run the elevator, anyway." The court said :

" Appellants invoke the well-known rule of law, that all conversations antecedent to, and at the time of the execution of the written contract are merged in the written contract," etc.,   *   *   *   " but the rule above relied on by appellants to defeat this decree, has its exceptions. It is the constant practice of courts of equity to resort to parol evidence where it is charged that contracts have been procured by fraud, duress or mistake; so courts of equity will reform contracts in cases of mistake, or annul them in cases of fraud, or construe them where there is doubt or vagueness as to the true meaning, and for that reason a resort to parol evidence becomes a necessity."   *   *   *

" Parol evidence is resorted to in cases of doubtful meaning, not for the purpose of altering or varying the contract, but

# 344    APPELLATE COURTS OF ILLINOIS.

for the purpose of ascertaining what the real contract was, and to enforce it as the parties intended it to be."

Held, that the right to have the elevator operated at the lessor's expense passed with the lease, although not mentioned in it.   Wilson v. Roots, 119 Ill. 379, 386.

" The rule is familiar and of frequent application in cases before this court, that where different instruments are executed as the evidence of one transaction or agreement, they are to be read and construed as constituting but a single instrument." Ruckman et al. v. Alwood et al., 71 Ill. 155, 158.

" It is alleged in the bill that the relation of debtor and creditor in respect to the money forming the consideration of the deed, was, by agreement, still subsisting between the parties, and that a re-conveyance was to be made by the grantee upon the payment of that money.   Assuming this to be so, it would be a fraud in Ruckman to set up that deed as absolute after the death of Alwood, as has been done.   Metropolitan Bank v. Godfrey, 23 Ill. 51.   And upon this ground parol evidence would be admissible to show the truth of the transaction.   If a grantee fraudulently attempts to convert into an absolute sale that which was originally meant to be a security for a loan, the original design of the conveyance, though contrary to the terms of the writing, may be shown by parol. 1 Hill on Mort. 31, 32, 33, and authorities in notes; Wright v. Bates, 13 Verm. R. 349; Nelson, Ch. J., in Patchin v. Pierce, 12 Wend. 61; · Morris v. Nixon, 1 How. (U. S.) 118; 1 Sug. on Vend. Vol. 1, 174 (8th Am. Ed.), and cases cited in notes." Wright v. Gay, 101 Ill. 233, 240.

" It is very well settled by decisions of this court that oral evidence is admissible in equity to show that an absolute deed was intended as a mortgage."

In Torrence v. Shedd, 112 Ill. 466, 481, Sorin conveyed land to Torrence by quit-claim deed dated January 12, 1880. The same parties entered into a subsequent agreement dated January 29, 1881, and another dated February 18, 1881, relating to the terms of the transaction.   The court, at page 475, said:

" It is true, as contended by appellees, the deed from Sorin

to appellant, and the contemporaneous contract between them relating to the same subject-matter, must be treated as but parts of the same transaction, and consequently should receive the same construction as if their several provisions were embodied in the same instrument."

Messrs. JOHN TULLY and H. K. WHEELER, for appellees.

HARKER, J. This was a suit in equity by appellant to restrain the heirs of George W. Cass from removing two dams situated in the Kankakee river at Momence. There is no dispute about the facts. The frictional questions are exclusively legal.

There is an island in the Kankakee river at Momence, which divides the stream into two nearly equal parts. The river there flows in a westerly direction. Over forty years ago two dams were erected, one from the upper end of the island to the south shore, and the other from the lower end to the north shore of the river. By means of these dams a large pool of water four or five feet deep was formed along the north side of the island and for a considerable distance above. The dams were originally constructed to furnish water power for a mill, but have not been used for that purpose for several years. The dams have been maintained, however, and the pool of water and beauty of the island have attracted a great many excursion, picnic and fishing parties during the summer season.

Appellant's railroad, running from Chicago to Danville, crosses the river a few hundred feet above the lower dam. It had been carrying excursion parties to the place for several years, and with a view to increasing its traffic and furnishing superior accommodations to pleasure seekers, in 1886 negotiations for the purchase of ten acres of the island were opened with George W. Cass, the owner of the island, the dams and 30,000 acres of land lying along the river above. Cass was a resident of New York and the negotiations were carried on entirely by correspondence between him and the general manager of the railroad.

In the first letter, written September 15, 1886, the general

manager asked whether the island could be purchased at a
moderate price, or whether a lease could be procured at an
annual rental to be continued so long as it would be used for
excursion purposes.   Cass at once replied that he would be
glad to arrange for a sale or lease of such portion of the
island as was adapted to the use of excursionists, and a few
days afterward wrote, proposing to sell 110 rods off of the east
end of the island for $5,000, or himself make such improve-
ments as might be agreed upon and lease the property for ten
years.    In this letter, he said, "you are aware that this is a part
of the mill property; the dams and water power still is exist-
ing.   In deeding Island Park, if the sale is made, I would
reserve the riparian and water right, and also the right to keep
in repair or rebuild the dam at the head of the island."   To
this letter the general manager replied September 29, 1886,
that he would be willing for Cass to reserve the right to enter
the premises for rebuilding or repairing the dams or any other
purpose, not interfering with the use of the grounds for
excursionists.   He also stated that "in order to give the
grounds any value for excursion purposes, it is indispensable
that the dams be kept up as at present, because if the dams
are to be taken away there would be no water in the time of
excursions to make the grounds desirable."

He also stated that aside from the water privilege, the
property was not worth more than $100 per acre.   In answer
to that letter Cass wrote admitting that first class farm land at
Momence could be purchased for $100 per acre, but that land
like that, with forest trees, surrounded with water for fishing
and boating, added $1,000 per acre to its value.   As to the
dams, he said : " As you say, the dam will have to be main-
tained, but I have not asked you to contribute to the expense
thereof."   On the 9th of October, 1886, the manager wrote:

" While I can not but think the price of the island very
large, yet, we are desirous of testing the grounds for excur-
sion purposes and prefer to purchase rather than to lease.
*Will you please state what is understood by the 'riparian
rights' which you reserve?* The definition says 'pertaining
to a bank of river,' and *if this does not interfere in any way*

*with the use of the grounds for our purposes*, I am disposed to accept your proposition of $5,000," etc.

It seems that at the time there was in force a certain lease executed by Cass to the Eugene Ice Company, granting the exclusive privilege of taking out the ice from the pond and using the mill property and island for that purpose, which lease had until the 1st of April, 1892, to run. In this lease it was provided that the ice company should keep the dams in repair; should construct a chute in the central portion of the lower dam eighty feet in length and capable of being lowered sixty inches so that the water in the pond could be easily let out and lowered sixty inches below the comb of the dam; that the ice company should have full control of the water from the 1st of November in each year until the breaking up of the ice in the spring and that from that time until the first of the following November the chute should be kept open.

In reply to the manager's letter of October 9th, Cass wrote inclosing a copy of the lease and also a copy of a reservation, to be incorporated in the deed, of the right to keep and maintain the dams and to go upon the island for the purpose of repairing them. The manager at once replied under date of October 16, 1886:

" I see no objections to the conditions or terms of the lease to the Eugene Ice Company, except that in order to make the island valuable for excursions it is necessary that the water should be kept up in the north branch of the river, so that boats may be run during excursion seasons. I notice the dam is so constructed that the water can be lowered five feet, and if this is done, the north channel will be dry, or nearly so, and no possibility of any boating. How can this be arranged? Is it your intention to have the water lowered as indicated in the lease to the Eugene Ice Company, during the summer season? If this can be made satisfactory, I shall be ready to accept the proposition for the sale on the terms mentioned in your previous letter, and as specified in my letter to you."

In answer to this letter Cass wrote as follows:

" In reply to yours of the 16th, have to say that the dams were rebuilt so as to lower them in the spring of the year when

the streams north are full, so as to draw the water rapidly from my lands, which have been subject to overflow. During last summer I do not think that the water was ever more than one foot below the comb of the dams. During excursion season there is no objection to the water being kept to the comb of the dams; should there be, as there sometimes is, very high water in June, it might be necessary to lower the dam for a few days to carry off the surplus water but never so as to interfere with the free use of the 'pool' or 'mill pond' for boating purposes."

The manager replied, expressing satisfaction with the representations of Cass and accepted the proposition of sale at $5,000, which sum was subsequently paid. A few days afterward a deed was executed and delivered through the mails, containing the following reservation and condition:

"Reserving and excepting, however, from said grant, the right to own, keep and maintain a dam, as the same at present exists, from the head of said island across said river to the left bank thereof, and for that purpose said grantor shall have the right to enter upon said premises at all times whenever, in his judgment, it may be necessary to make repairs, rebuilding or replacements.

"And it is further agreed between the parties hereto, that said grantor may own, keep and maintain a dam, as the same at present exists, from said island across said river to the right bank thereof; the intent and object of this reservation and covenant being to retain in the grantor, his heirs and assigns, the free and unincumbered use and enjoyment of all the water power and other privileges for manufacturing purposes and otherwise, including the privilege of owning and appropriating to his own use the ice that may be formed on said river, above said dam.

"It is also agreed that this grant is taken subject to the terms and condition of a certain contract made between the said George W. Cass and the Eugene Ice Company, dated the 15th day of September, A. D. 1884, a copy of which is hereto annexed."

In the spring following, the railroad company began the

erection of buildings, placed a large number of pleasure boats in the stream and otherwise beautified the island so as to attract pleasure seekers.

In this way it expended about $12,000 in addition to the $5,000 paid Cass.    It also made an outlay of between $30,000 and $40,000 in excursion cars to carry excursionists from Chicago to the island.    The dams were maintained during the seasons of 1887, 1888 and 1889, and because of the improved carrying facilities and the enhanced attractions of the place, upward of forty thousand people were taken there over appellant's road during the months of June, July and August of those years.

During the year 1889, George W. Cass died, and his heirs came into possession of his real estate at Momence, and large tracts of his lands above there, mostly in the State of Indiana.

In the spring of 1890, William R. Shelby, husband of one of the heirs, and Charles W. Cass, one of the heirs, had an interview with appellant's general manager in which they stated that they desired to excavate the rock in the river along the side of and above the island some three feet in order to drain the lands of the heirs, as authorized by an act and appropriation of the legislature of the State of Indiana.    For that purpose they claimed that it would be necessary to entirely tear away the dams.    Ths general manager objected upon the ground that to tear away the dams would render valueless to appellant its entire island property.    Notwithstanding his objection, the heirs, some time during the month of May following, caused the removal of the chutes and the turning out of all the water in the pool, thereby entirely destroying the facilities for boating.    Appellant thereupon replaced the chutes and upon a presentation of its bill secured a temporary injunction restraining the Cass heirs from tearing down the dams or from in any manner lowering the water on the north side of the island, and from interfering with appellant and its agents from so repairing the dams as to keep the water on a level with the top of the comb.

By agreement of parties the bill was dismissed as to all the heirs excepting Mary C. Shelby, who had, since the death of

her father, become the owner of the mill property, the dams and the lands adjacent to the river above.

Her answer denies any obligation on the part of Cass to maintain the water in the pool to the comb of the dams, as charged in the bill, claims that the correspondence and representations made by her father, pending the negotiations, were finally merged in the deed of November 12, 1886, and that appellant took the land subject to all the conditions in the lease of the Eugene Ice Company, and denies that appellant, being a corporation organized under the laws of the State for the purpose of constructing, maintaining and operating a railroad, had any right or power to purchase or operate picnic grounds.

The cause was referred to a master who took and reported the proofs. Coming on for a hearing, it was submitted without argument, and the Circuit Court rendered a decree dissolving the injunction and dismissing the bill. From such decree the appellant prosecutes this appeal. On motion the injunction was continued in force pending the action of this court.

On the part of appellant it is contended that there was an agreement upon the part of George W. Cass, as evidenced by his letters to the general manager, that the dams should be maintained, which induced the purchase of the island; that such agreement is enforcible against those holding under him as heirs; that the continued use of the mill pond as it existed at the time of the grant to the appellant, was appurtenant to the island; that the existence of the mill pond was necessary to the enjoyment of the island for the uses in contemplation when sold, and that the conveyance of the island, therefore, carried with it the right to have the pond maintained as it then existed, the maintenance thereof being within the control of the grantor, who owned the dams.

Upon the other hand it is contended on the part of appellees, that there was no such undertaking or agreement by George W. Cass to maintain the dams as can be enforced; that any promise or representation made to that effect, pending the negotiations, must be considered as merged in the deed with

its reservations and conditions; that the correspondence had prior to the execution of the deed can not be considered as evidence because it varies the terms of the deed; that the reservations in the deed show conclusively that the free and uninterrupted control of the water was retained in the grantor; and further that in the purchase of the island for use as picnic grounds, the appellant exceeded its authority as a railroad corporation and can not have the aid of a court of equity to enforce an alleged contract which is, for that reason, contrary to public policy.

An examination of the correspondence carried on between the general manager and General Cass leaves no doubt as to the purpose for which the island was purchased, and that Cass fully understood the purpose. Demanding a sum nearly ten times the value of other real estate in the immediate vicinity because of the water pool making it attractive to excursionists, he represented to the appellant that the dams should be maintained at his expense as an inducement to the purchase. His letters clearly show an undertaking upon his part to maintain the dams and allow the water to remain in the pool during the excursion season, unless, in the event of a rise in the river in June, he should want to open the chute for a few days to allow the accumulation of water on his lands above to run off, but never to such an extent as would interfere with the free use of the water for boating purposes. This was recognized and acquiesced in by him until his death. To allow the dams to be torn away and the rock excavated from along the side of the island would render appellant's property valueless for the purposes for which it was purchased, and under the circumstances would work a great injustice to appellant. It should not be allowed unless it be held that the representations and undertaking of General Cass, as shown by his letters, are variant from the terms of the deed, and for that reason must be considered as merged in it.

It is not an unvarying rule that all conversations and representations antecedent to, and at the time of, the execution of the written contract, are merged in it. It has its exceptions, and courts of equity frequently indulge them to prevent injus-

tice.  Notable exceptions are those where the injustice would
be accomplished through fraud, duress or mistake.  In such
case the court will look beyond the terms of a single transac-
tion, and any evidence, whether by correspondence or other-
wise, tending to show the real nature of the contract, is
admissible; and the court will give effect to the actual contract
as disclosed by the written instrument, and such additional
evidence.  Schmohl v. Fiddick, 34 Ill. App. 190; Metropoli-
tan Bank v. Godfrey et al., 23 Ill. 531; Ruckman v. Alwood,
71 Ill. 155.

Courts of equity will, in the enforcement of a contract,
endeavor to execute the true intention of the parties, and to
arrive at the intention of the parties, will, when necessary,
consider extrinsic evidence.  When thus the true intent is
disclosed, the contract will be enforced, unless to do so would
work a plain violation of the language employed in the written
instrument.  Such evidence is not resorted to for the purpose
of altering or contradicting the written contract, thereby mak-
ing a new contract repugnant to the writing, but for the pur-
pose of ascertaining the points upon which the minds of the
contracting parties agreed.

If the intent, as disclosed by the extrinsic evidence, is so
inconsistent with the plain language of the writing that to
give it effect would make a contract entirely repugnant to the
plain meaning of the words in the writing, then, of course, the
intent, as disclosed by the extrinsic evidence, must yield to
the intent expressed by the words in the writing.

The language of Justice Lawrence in the case of Robinson v.
Stow et al., 39 Ill. 568, is:  " While it is not the province of
courts to interpolate new terms into contracts against the evi-
dent intention of the parties, with the view of making such
contracts more reasonable, yet, on the other hand, even a
strained construction of the language will be adopted for the
purpose of preventing obvious injustice.  The intention of
the parties, it is true, must govern; but the experience of
human affairs teaches courts that this intention is not to be
sought merely in the apparent meaning of the language used,
but this language may be enlarged or limited by reference to

C. & E. I. R. R. Co. v. Shelby.

the circumstances surrounding the parties, and the objects they evidently had in view."

Were it not for the reservation in the deed and the recital that it was subject to the terms contained in the lease to the Eugene Ice Company, there could be little doubt of appellant's right to the water privileges in the pool and to having the dams maintained. The enforcement of the agreement in that regard would do no violence to any provision in the deed.

A reasonable construction to be placed upon the reservation is, that it simply reserved the right to keep and maintain the dams as they existed at the time, the right to go upon them for the purpose of repairing and rebuilding them, the right to the free and unincumbered use of the water power for manufacturing purposes, and the right to harvest the ice forming in the river above the lower dam.

Instead of there being anything in this reservation at variance with the contention of appellant that the maintenance of the dams had been agreed to by General Cass, it is, really, in harmony with such contention.

While it is recited in the deed that the grant was subject to the terms and conditions contained in the lease to the Ice Company, and it was provided by the terms of the lease that although the Ice Company should have full control of the water from the 1st of November of each year until the breaking up of the ice in the spring, but that from the time until the 1st of November following, the chute should be kept open, it should be borne in mind that when a copy of the lease was sent to the general manager that he wrote General Cass objecting, that if the chute was to be kept open as indicated by the lease, from spring until November, there would be no possibility of boating; that Cass replied that during the excursion season the water could be kept to the combs of the dam, except in case of very high water, in June, when it might be necessary to lower the dam for a few days to carry off the surplus water, *but never so as to interfere with the free use of the pool for boating purposes.*

Having made this representation, equity would seem to

dictate that Cass and his heirs were estopped from having that condition in the lease enforced. It is apparent from the evidence that appellant paid $5,000 and accepted the deed, solely upon the faith that such condition would not be enforced. Specially interrogated about it as Cass was, he and his heirs were bound by the declaration then made and which induced the purchase. The law requires of every man good faith when he makes declarations upon which he knows others may act to their prejudice. Knoebel v. Kircher, 33 Ill. 308; Parmelee v. Lawrence, 44 Ill. 405; Hefner v. Vandolah, 57 Ill. 520; Kinnear v. Mackey, 85 Ill. 96; Hill v. Blackwelder, 113 Ill. 283; Schmohl v. Fiddick, 34 Ill. App. 190.

We think it a reasonable construction and limitation of that clause in the deed which recites " That this grant is taken, subject to the terms and conditions of a certain contract made between the said George W. Cass and the Eugene Ice Company dated the 15th day of September, 1884, to hold that its intent and purpose was to protect the rights of the Ice Company under its contract and the rights of Cass under it, except as to the one providing that the chute should be kept open from the date of the breaking up of the ice in each year until the first day of November following." Any other construction supposes Cass to have intended to reserve the right to act in bad faith. That he intended no such thing is evidenced by his conduct in allowing the chute to remain closed during the excursion seasons from the date of the deed to the time of his death. Such conduct plainly evinces the construction which he placed upon it, and we do no violence to the terms of the contract in adopting it as our interpretation. Vermont Street M. E. Church v. Brose, 104 Ill. 206; Hall v. First National Bank of Emporia, 133 Ill. 234.

Under all the facts and circumstances, as disclosed by the evidence, we think the continued use of the pool which bordered the island, as it existed at the time of the grant, was appurtenant to the island. Its existence was necessary to the enjoyment of the property for the uses for which it was sold by the grantor and accepted by the grantee. The conveyance of the island carried with it the right to have the pool maintained

as it then existed, the maintenance of the dams being within the control of the grantor. The dams had been maintained for many years. Opened, it is true, during spring freshets, but closed again when the surplus water above had passed out; they were kept closed during the summer season. The pool of water thereby maintained afforded the attractive feature of the island. Without the pool the island would be useless for the purposes for which it was purchased. It must be presumed, then, that the grantors intended to convey, and the grantee expected to receive, not only the thing specifically described in the grant, but the thing necessary to the enjoyment thereof, and by reason of which a large price was asked and received. 2 Blackstone, 36; Thomas v. Wiggers, 41 Ill. 470; Morrison v. King, 62 Ill. 30; Piper v. Connelly, 108 Ill. 646; C. R. I. & P. R. R. Co. v. Smith, 111 Ill. 363.

We see no force in the contention of appellees that the railroad company exceeded its corporate powers when it purchased the island for the picnic grounds, and that the enforcement of the alleged contract would be against public policy. The purchase of the island was made with the sole view of increasing the passenger traffic of appellant's road, and seems to have well accomplished that purpose. But be that as it may, however, appellees are in no position to question the right of the company to purchase and maintain the grounds for picnic purposes.

While the appellant is not entitled to an injunction as broad as the one sought and temporarily ordered, he is entitled to a decree restraining the destruction of the dams, and restraining the lowering of the chutes during excursion seasons, except in cases of high water, when they may be lowered sufficiently long to allow the surplus water above to run off, but never so as to interfere with the pool for boating purposes.

The decree of the Circuit Court will be reversed and the cause remanded with directions to enter a decree in accordance with the views expressed in this opinion.

*Reversed and remanded with directions.*