Samuel Ireland in his lifetime filed a bill alleging that some time prior to the 28th day of September, 1921, he entered into an agreement with the Penn Motors Corporation, wherein he agreed to convey to the said corporation, the lands and premises described in the bill, upon the condition that the defendant company would give its bond for $4,500 to be paid in five years from the date of said conveyance and to be secured by a purchase-money mortgage in the sum of $4,500 payable in five years from the date thereof, without interest, and that they would enter into an agreement to reconvey the lands to complainant in the event the Penn Motors Corporation should fail to erect an assembling plant on the said property within six months from the date of such conveyance.
That the agreement was reduced to writing and settlement was made on September 28th, 1921, at which time complainant executed and delivered a deed for the land and premises, and the Penn Motors Corporation executed and delivered to complainant, a bond and mortgage in the sum of $4,500 payable in five years from date thereof without interest.
The bill further alleged that the Penn Motors Corporation had caused the bond and mortgage to be prepared, and that complainant was informed by defendants or its agent that the bond and mortgage covered the terms of said previous agreement, which agreement has since been lost, and that such representation was false and fraudulent, and a fraud upon complainant.
On December 17th, 1924, Margaret Ireland filed a petition showing that Samuel Ireland died on October 6th, 1924, and that letters testamentary had been issued to her and she as such executrix was substituted as party complainant.
After hearing, on December 23d 1924, an order was advised referring the cause to the supreme court, Atlantic county circuit, for trial. From this order an appeal was taken and it was set aside. A further hearing was had.
I am convinced that the complainant has proven that an agreement was entered into between Ireland and the Penn *Page 168 
Motors Corporation substantially as set forth in the bill, and that agreement the present complainant is unable to produce.
Raymond Ireland, son of Samuel Ireland, saw the agreement, details its appearance, and testifies: "I can't state the exact contents, but the agreement was that he was to convey this land to them for the use of building an automobile factory; they were to start operation within six months and if they failed to start operation within six months they were to give him the property back, convey the property back to him. He was to take a mortgage of $4,500, without any payment down whatever, and with no interest for five years."
He also states: "That in the presence of Sofield, the representative of the motor company, he explained to Mr. Weaver, Mr. Cale, Mr. Thompson and Alvert James, all members of the chamber of commerce of Pleasantville, that his father had agreed to convey it over to them with the provision that they would start operation within six months, and that if they didn't start operation they was to return it to him. I didn't mention, I don't think, the mortgage."
Mr. Sofield made no dissent to the statement.
Mr. Fox stated he saw in Mr. Samuel Ireland's possession the agreement between Ireland and Penn Motors Corporation, and that "the paper stated the Penn Motors Corporation were going to erect a factory on this particular block and if they didn't start contruction within a period of six months then the property would be deeded back to Ireland."
Raymond P. Thompson testified: "Mr. Ireland informed us that his father had agreed to give the Penn Motors Company this piece of ground on the boulevard with the provision that they build on it and use it for the purpose of their manufacturing — that is, he was to take back some kind of a mortgage, making payments and interest very easy, so that they could proceed at once without any outlay of cash or capital for the purchase of the ground. This agreement seemed to be very satisfactory * * *. Mr. Ireland said that his father gave this property to the Penn Motors Company so that they could go ahead without the outlay of any capital and that in the event that they did not use it, it would be returned to him. *Page 169 
"Mr. Sofield had maps showing this proposed layout, proposed sidings of the railroad, and he discussed this proposition of being able to unload freight cars there and the advertising advantages of this site, and he said that he was satisfied with the agreement and that we need not look further for any piece of ground, that they were going to take that piece."
John Weaver testified: "The substance of it was that Mr. Ireland was willing to convey to him the piece of property down there on which to locate this proposed factory. As to the terms under which he was to do it I know nothing, because I didn't catch that conversation referred to that. I have no recollection as to that."
He also testified that Mr. Sofield told him "at various times, numerous times, that they were going to build on that property."
Albert E. James testified: "Myself, Mr. Weaver, Mr. Thompson and Mr. Cale, I recollect those four very well, and I think Mr. Wooton came in there during the meeting, was there, and Mr. Sofield and Mr. Harry Johnson, to my best recollection was there, Mr. Harry Johnson with Mr. Sofield. We had been making every effort to try to get together a location for the Penn Motors Corporation, exhausting practically every source that was possible to do so to try to find a location to encourage the industry to come to the town. During that meeting Mr. Ireland came in and reported that after quite a little bit of conversation with his father he had induced his father to convey to the Penn Motors Corporation, company, or was about to do that — that transaction I believe came off a day or two later — to convey to the Penn Motors Company, without any interest or anything, to start manufacturing motor trucks, to induce the corporation to come to the town. That is, as I understood Mr. Ireland's report to the committee. I was then a member of city council, acting in co-operation with the chamber of commerce, trying to get the industry there if it was possible. During that meeting Mr. Ireland came in and made that report, which made us all feel very happy about the proposition *Page 170 
because we thought it was going to be an addition to the town, and I remember very distinctly that Mr. Ireland made his report to the committee or in conversation there that his father had conveyed that piece of ground to the Penn Motors Corporation with the understanding that they would erect a factory for the erection of motor trucks within the period of six months' time.
"Q. Was there anything else said about it that you recall in reference to the conveyance of the land or the failure to build the plant within six months?
"A. Mr. Ireland made the remark that his father was willing to make that agreement and in the event of this corporation not proceeding as per agreement that the land was to be reconveyed to his father.
"Q. Now, you spoke of him saying that it had been conveyed, I understand you, maybe I didn't; did he say it had been or would be conveyed, do you recall?
"A. No, he said that in conversation —
"The Court — He said he was willing to do it.
"A. Yes, that his father was willing to do it and I think it was a few days later than that, that that happened."
Rollan C. Cale testified: "Mr. Sofield, or the man associated with him, I don't recall his name, and Mr. Ireland stated — that we had been looking around several days previously trying to locate a suitable site — Mr. Ireland said that he had talked it over with his father and had made arrangements where his father would give them the privilege of erecting their plant on this tract of land on the meadows for the puropse of building their plant. The question came up as to the question of railroad siding, seemed to be the general opinion that if any siding * * *."
George S. Brooks saw the agreement in question. He testified: "It provided for the * * * Mr. Ireland agreed to allow the Penn Motors Company the use of this block of land provided they put up a building within six months, and that, furthermore, he agreed to take back a mortgage for a period, I think, of five years, without interest; that if the building was not put up in six months or the erection or commencement *Page 171 
of the erection of the building was not commenced within six months they would reconvey the land."
He further testified that it was signed by Ireland and Penn Motors Company, by Sofield.
Hilton W. Sofield the president of the defendant corporation, testified that he never had an agreement in writing with Ireland; that he has no recollection of signing any such agreement; that he never had an agreement with Ireland that the property would be reconveyed to Ireland, unless a plant was built or building commenced within six months from the date of the agreement.
He further testified that "Mr. Ireland said he would sell us this property for $4,500, which would be all mortgage, no interest bearing for five years, if we didn't use this property within that time we had the privilege of paying the mortgage or reconveying the property."
Having found that an agreement existed between Ireland and Penn Motors Corporation, that Ireland would convey the property without consideration, and that a purchase-money mortgage to run without interest for five years, and to reconvey the property if it was not built upon within six months from the date of the agreement, and that the conveyance was made and the bond and mortgage executed and delivered, each without the agreement to reconvey, the question for determination is: Is the covenant to reconvey merged in the deed?
The court of errors and appeals, in Merchants, c., Co. v.Mercer Realty Co., 99 N.J. Law 442, held: "Where a deed is made in pursuance of an executory agreement to sell lands, in which there are independent and collateral provisions, the rule of merger does not apply."
In this case, there was an agreement that all improvements on the premises had been paid for in full, and there were no assessments pending against the same, which was independent and collateral to the deed. It was held that in this situation there was no merger, because covenants in an executory contract, independent and collateral to the deed given in pursuance thereof, are exceptions to the merger, and cited: *Page 172 Long v. Hartwell, 34 N.J. Law 116, 122; 18 Cyc. 271 § 231;27 Rul. Cas. L. 532 §§ 264, 265; 13 Cyc. 616.
Vice-Chancellor Backes in Matthews v. Emdin,93 Atl. Rep. 881, recognized this rule: "Nor was there a merger of the contract for the sale of the land into the deed and mortgage so as to operate as a performance, or a waiver of performance of the agreement for the sale of the stock."
The rule as laid down in Corp. Jur., supra, is: "When a contract of sales provides for the performance of acts other than the conveyance, it remains in force as to such other acts until full performance, so, also, independent and collateral agreements are not merged, nor are purchaser covenants necessarily merged or discharged."
It was held in Illinois that: "Where the negotiations for the purchase of an island for picnic purposes are all in writing and show all the elements of the contract including an agreement by the vendor to keep up a certain dam whose maintenance is necessary to the proposed use of the island, the agreement in regard to the dam is not so merged in the deed afterwards given, in which such agreement is not specifically inserted, as to be incapable of enforcement in equity." Shelby v. Chicago E.I.R. Co., 42 Ill. App. 339; affirmed, 32 N.E. Rep. 438.
A case practically on all fours with the present case is Doty
v. Sandusky Portland Cement Company (Appellate Court,Indiana), 91 N.E. Rep. 569.
It was there held that "a contract for the purchase of land provided that, if a factory was not built by the purchaser on the land purchased, the vendor could have a reconveyance.
"The purchaser took possession of the land made the payments provided by the contract, and received a deed, but did not construct a factory. Held, that the rule that the terms of a preliminary contract for the sale of real estate are merged in the deed did not apply, since the covenant as to the construction of the factory was independent and collateral and not a preliminary agreement."
Judge Roly said (at p. 571): "The court [below] sustained a demurrer to the pleading, we are informed, upon *Page 173 
the settled proposition that the terms of a preliminary contract for the sale of real estate are merged by the deed subsequently made." Lucas v. Hendrix et al., 92 Ind. 59. There are many cases in which this rule has been stated, and the question is not as to the rule, but as to its application. We are of the opinion that it does not apply. The contract heretofore set out is very much more than a preliminary contract for the sale of real estate. The execution of the deed does not operate as a merger where the covenants of the contract are collateral and independent, and do not have to do with the title, possession, quality, or emblements of the land conveyed. Carr v. Roach, 2Duer. (N.Y.) 20. That provision which it is now sought to enforce stands on the same footing that it would had a separate contract for repurchase been made between the parties. "The paper is an independent contract, which embraces as one of its provisions the making and delivery of a deed for the land, and of course was not merged in the deed subsequently made." Kemp v.Penn Co., 156 Pa. 430; 26 Atl. Rep. 1074; Ludeke v.Sutherland, 87 Ill. 481; 29 Am. Rep. 66; McGowan v. Bailey,146 Pa. 572; 23 Atl. Rep. 387; Close et al. v. Zell, 141 Pa. 390; 21 Atl. Rep. 770; 23 Am. St. R. 296. The exception from the general doctrine first stated has been often declared. Durkin
v. Cobleigh, 156 Mass. 108; 30 N.E. Rep. 474; 17 L.R.A. 270;32 Am. St. R. 436; Saville v. Chalmers, 76 Iowa 325;41 N.W. Rep. 30; Trayer v. Reeder, 45 Iowa 272; Bogart v. Burkhalter, 1Denio (N.Y.) 125. This leads to a reversal of the judgment.
It therefore follows that a decree must be advised in favor of complainant. *Page 174