On April 1st, 1926, the defendants executed a bond and mortgage to the complainant in the sum of $14,000. There is claimed to be due upon the mortgage the full amount thereof together with interest from the date of its execution.
The controversy between these parties has really developed a final hearing which has been concerned with the legality of the bond and mortgage in question under a special defense setting up serious fraud alleged to have been committed by the complainant.
Toward the end of the month of March, 1926, the complainant had purchased two parcels of land in the borough of Rutherford, New Jersey, located on one of the principal streets, one piece lying at a corner of Union avenue and Carmita avenue, the other being separated therefrom by about fifty feet of intervening land and being sixty feet in width. At that time the defendants were acting in combination for the purchase and improvement of vacant property and the subsequent sale thereof at a profit. One of them, Schomer, was the expert member on the value of real estate and the financing of their enterprises, the other two being skilled in the mechanical work of the improvements. Schomer discussed with the complainant the purchase of the corner lot mentioned above, and, as a result of such talk, the complainant agreed to convey both parcels in consideration of the payment of $20,000, a portion of which was to be made up by his taking back the mortgage which he now seeks to foreclose. As to all these facts there is no dispute. The single narrow issue is presented by the charge made by the defendants that at the *Page 562 
time of the negotiations for the conveyance, and at the time of the making of the conveyance itself, the complainant assured them that at that time he had been granted permission by the appropriate body of the borough to erect upon the corner lot a number of stores. No such permit has ever been issued. The complainant denies that he ever said he had it. The value of this, it is said, lay in the fact that that particular section of Rutherford was included within a zone restricted to the erection of one-family dwelling houses. There is no dispute between the parties that this assurance, if given, was collateral to the main transaction and, therefore, not within the parol evidence rule.5 Wigm. Ev. (2d ed.) § 2340; Long v. Hartwell,34 N.J. Law 116; Merchants, c., Co. v. Mercer Realty Co., 99 N.J. Law 442;Ireland v. Penn Motors Corp., 100 N.J. Eq. 166. Furthermore, the charge of fraud takes it out of the rule. 2 Pom. Eq. Jur.
(4th ed.) § 858.
It has just been said that up to the last point mentioned there is no material dispute, but from there on the proofs bristle with contradictions. The defendants say that Schomer had been a close personal friend of the complainant for a period of twenty-four years, during which he had formed such a high opinion of the latter's character that he was willing to accept at its face value any assurance that might come from him. Consequently, when Schomer entered upon these negotiations without the presence of his associates he did not have the slightest doubt that the complainant had been allowed a building permit. Later on, when the other defendants came into the transaction, they, lacking the faith that Schomer says he had in the complainant, remonstrated with their business expert when he refused to demand that the complainant exhibit the permit which would make it possible for them to accomplish the improvements they contemplated on the premises to be purchased. To this they were curtly told by Schomer to leave the matter to him as he knew what he was about.
After the transaction had been closed, the defendants learned, almost immediately, that no such permit was in existence. *Page 563 
Even this does not seem to have shaken the confidence inspired in Schomer's breast by the complainant. There then entered into the drama, Mr. Jaffe, a member of our bar, the brother-in-law of complainant and his legal adviser. Mr. Jaffe secured from a member of the Supreme Court a rule to show cause why a writ ofmandamus should not issue to compel the ganting of a building permit by the authorities of Rutherford. This proceeding appears to have been prosecuted until about the month of July, 1926, when it was abandoned and the defendants say their minds were made up that they would neither seek the permit nor go through with the transaction theretofore had with the complainant.
On August 3d 1926, a full covenant and warranty deed was recorded in the office of the clerk of Bergen county, conveying the same premises under consideration back to the complainant and his wife from two of the defendants, the third (Schomer) having previously conveyed his undivided one-third thereof to those defendants. This deed was witnessed by, and the acknowledgment thereof was made before, Mr. Max Schomer, also a member of the bar, and the son of the above-mentioned defendant. This somewhat startling fact the defendants undertake to explain by saying that an arrangement was finally consummated among the parties whereby the complainant agreed to take back the lands in question and forego any rights under this mortgage. The peculiarity of the mortgage not having been canceled, they also explain by saying that the complainant persuaded them not to demand a cancellation by telling them that the marketing of the property would be more easily accomplished if a purchaser knew that a portion of the price he would have to pay would be in the form of a mortgage that he could assume. Just how the complainant was to avoid a merger of the mortgage the defendants do not undertake to show.
A further difficulty with regard to this conveyance of August 3d arises out of conflicting testimony as to the occurrences in which Schomer was interested on that date. The defendants say that Schomer had extended his real estate operations into the then flourishing market of Florida, and *Page 564 
that he had at or about that time received word from the south that made it imperative for him to repair there; that he left his home on that morning, accompanied by some of the members of his immediate family and the other two defendants; that they all proceeded by automobile to the home or shop of the complainant, to whom delivery of the deed was made; that the complainant thereupon requested that the defendants, who were obliged to pass through the county seat of Bergen county, should do him the further kindness of having the deed recorded. It is related by Schomer that the urgency of speed was so great that he even neglected to secure from the complainant before he left the necessary recording fees which he fixed at $2 in his testimony. An endorsement in pen and ink upon the deed itself indicates that the fees totalled $2.90.
The testimony just summarized was given on the 13th day of November, 1928, at the conclusion of which day the proofs had not been closed. The hearing then went over to the second day thereafter, when the complainant produced in court, in defense of the defendants' counter-claim, a witness named Gross, who swore that on the morning of August 3d 1926, there arrived at a summer camp which he operates in the Green Mountains a person none other than the complainant. In corroboration of his testimony this witness produced the register of the camp, which he is obliged to keep pursuant to the law of the State of Vermont, and a book of records which is kept for the purpose of making up the annual income tax return and which shows all payments made by guests. The register shows that the complainant and his family arrived on the morning of August 3d 1926, between the ordinary hours for the serving of breakfast and the midday meal according to the usual custom at such resorts. On page 46 of the book of account there appears, under date of August 8th, 1926, a regular, clear entry in ink against Mass. and his party of $183.60. He testified to a clear recollection of having received in payment of such charge a check drawn by Mass. for an amount $50 more than the face of the bill, and to giving the complainant a receipt in full and $50 in cash. In *Page 565 
corroboration of that testimony the complainant has produced his check for the exact sum of $233.60, which bears the endorsement of the banks through which it was collected and is stamped by perforations, "PAID," on August 14th, 1926.
Here we have presented testimony tending to place the complainant in two different places, separated by a distance that may be roughly estimated as two hundred and fifty miles and at least from eight to twelve hours apart by the usual mode of travel and the one which the complainant says he adopted. And this duel presence, if both sides are to be believed, was simultaneous, or nearly so, which, of course, is a physical impossibility.
Surely I am not expected to devote very much time to a discussion of these last-mentioned conflicting proofs. In fact, I think that no more is necessary than to refer to defendants' counsel's attempt to pass this awkward situation, which was the suggestion that the defendants might all have been mistaken in testifying to the alleged transaction with the complainant, as to the date only. He adroitly, and with excellent judgment, failed to attempt any explanation of the recording date officially endorsed on the deed, connected as it is with the triple oaths of the defendants that the transaction with the complainant in Rutherford was on the same morning that the deed was recorded. They circumstantially detailed the pretended occurrences and the official endorsement of the deed shows how keen these memories are. Why, the generous Schomer even recalls having paid for its recording, after all his ill treatment by his trusted friend, the complainant!
Briefly, I do not believe any one of the defendants on the narrow issue presented by this case, namely, whether or not the complainant fraudulently misrepresented that a building permit had been obtained, and for the following reasons: First, the proofs clearly show that they will stick at nothing when their testimony of the alleged transaction of August 3d is considered. Secondly, the trick and device to which they then resorted proves how desperate was their position with *Page 566 
regard to the true transactions between the respective parties. Thirdly, I was unfavorably impressed by their demeanor upon the stand as contrasted with that of the complainant. Schomer, I regard as a very intelligent man but an unreliable one, not only because of what has just been said but because his story is inherently improbable. It is inconceivable that a man of his intelligence, experience, success and vocation would have been guilty of such assinine stupidity as to have relied upon the unsupported word of any man in a $20,000 transaction out of which he and his associates would have hoped to have made many thousands of dollars profit or possibly have lost some such amount. The other two defendants gave all of the familiar appearances of reciting and sticking to a well-learned story. Finally, we have the unbelievable situation of the defendants, led by their able captain, learning in the spring of 1926 that they had been grievously defrauded; discouraged by the month of July to the point where all effort to secure the coveted building permit (after the constitutional amendment had been adopted and after some of the justices of the supreme court had indicated to the public an intention to reverse their previous position in deference to the majority of our citizens). And yet they never appealed to this court to relieve them from the consequences of the fraud they charge against the complainant, until after this bill had been filed to enforce the provisions of the mortgage of April 1st, 1926. The most stupid man, in the circumstances in which they say they found themselves, would have rushed to the chancellor with the greatest speed. And these men were acting under the guidance of a legal adviser who was quick, when forced to do so, to retain counsel of standing and ability.
I am sorry that I am unable to bring myself into agreement with counsel that Schomer was ingenuous in reciting his great faith and confidence in the complainant. That, of course, would explain the defendants' position to a great extent, although, as I have often said before, courts become weary from so many explanations made by litigants in the hope of being relieved from awkward situations evidenced by *Page 567 
their respective signatures. That a man of Schomer's type would have trusted, as he says he did in the first place, strains one's credulity. What, then, is to be said of his brusque refusal to be advised afterwards, either by his counsel or his business associates whose fortunes were being committed quite as much as his. It seems to me that no disinterested person could be expected to believe he would have failed even to have meekly suggested that the permit should have been mentioned in the estoppel agreement executed contemporaneously with this mortgage. But even if the law is to be assumed to be such an ass as to believe this much of the story, what shall be said of the insult added to injury when that trust and confidence is asseverated to have been so enduring and senseless to repeated blows that Schomer again, without the scratch of a pen, delivered himself, bound hand and foot, into the hands of the complainant by the execution, delivery and recording (at Schomer's expense) of the reconveyance so unfortunately placed as having occurred on August 3d?
The defendants say that at the first meeting of all the parties, when the complainant was asked to show his permit, he said that it was at another place, but displayed the counterfoil of a check showing payment of $32 therefor. From this it is argued that the defendants must be telling the truth, because otherwise they would not have known of the $32 payment to the borough of Rutherford. The complainant says that, in the general talk usually attending such a meeting, he had said that he had secured a permit to erect stores upon the sixty-foot plot lying fifty feet away from the corner property, but did not say that he had secured any such permission covering the corner plot. Now it is clear that these keen men would have talked over the cost of the erection of the complainant's contemplated improvement, from which it would have been a simple mathematical calculation to have determined the governmental fee required. In fact, it is more than probable that the amount of such fee was discussed, because I think it is undisputed that the complainant insisted that the defendants should restore such sum to him, *Page 568 
since they, and not he, were to enjoy the benefit therefrom. It is perfectly clear to me that the defendants, after being disappointed in their request for a permit (after their success in a like venture in another municipality), laid grasp upon the complainant's mention of a permit on the sixty-foot strip and now attempt to apply it to the corner plot.
There is just one element in the case which would appear to give some support to the defense and counter-claim: That was the activity of Mr. Jaffe, the complainant's solicitor and brother-in-law, in the mandamus proceeding. It is true that ordinarily a vendor who had made no representation in the premises would not have interested himself, nor would his lawyer, in procuring such a permit, and it is equally unescapable that Mr. Jaffe did not gain any laurels as a witness in delivering his testimony. His appearance on the stand was typical of lawyers as witnesses. Although he expended some labor in that proceeding he has never attempted to collect from his ostensible clients, the defendants. In the first place the complainant had made a very lucrative disposition of the lands mentioned above. It may well have been when he found that he might lose the fruit of his speculation that he attempted to forestall such loss by attempting to secure and put into the hands of the defendants the permission to erect, which was the sine qua non of their successful operation of their newly acquired property. In the second place, lawyers as a class are lamentable failures in the giving of evidence. And, finally, the explanation given by Mr. Jaffe for not attempting to collect his fee after the transactions of April the first had blown up is a perfectly probable one. I suppose it would have aroused the mirth of the defendants if Mr. Jaffe had demanded anything from them, in view of the situation in which they found themselves.
Without passing upon the question of criminal law which may be involved in the successful prosecution of an indictment, I feel it my duty to transmit to the deputy attorney-general in charge of the office of the prosecutor of the pleas of Hudson county, a copy of this decision together with a transcript of so much of the testimony of the three defendants, *Page 569 
the complainant, and the witness Gross as will enable him to decide whether or not an indictment will lie. In the meantime, I will impound in my own possession those exhibits in the case at bar which bear upon August 3d 1926.
I will advise a decree in conformity with the prayer of the bill and the dismissal of the counter-claim.